George **POWELL,** et al., Plaintiffs,

v.

**CAREY INTERNATIONAL, INC.,** et al., Defendants.

No. 0521395CIV.

United States District Court, S.D. Florida.

March 1, 2007.

Order Denying Reconsideration April 10, 2007.

Chris Kleppin, Harry O. Boreth, Glasser Boreth Ceasar & Kleppin, Plantation, FL, for Plaintiffs.

Kristy Marie Johnson, Carlton Fields, Miami, FL, Patricia Halvorson Thompson, Carlton Fields, Miami, FL, for Defendants.

*ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AS TO THE INAPPLICABILITY OF THE TAXICAB AND MOTOR CARRIER EXEMPTIONS, DENYING ALL OF PLAINTIFFS' REMAINING CLAIMS, AND GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT VINCE WOLFINGTON*

SEITZ, District Judge.

THIS MATTER is before the Court on Plaintiffs' Motion For Partial Summary Judgment On All Issues Other Than Issues Related To The Calculation of Damages ("Plaintiffs' SJ Motion") [DE 241]. In a previous Order [DE 322], the Court briefly addressed two of the issues raised in Plaintiffs' SJ Motion.[1] This Order discusses these two issues, namely, (1) the statute of limitations and (2) liquidated damages, in more depth and also addresses Plaintiffs' remaining five requests for judgment as a matter of law as to (3) Defendants' contractual defenses and counterclaims, (4) the inapplicability of the taxicab exemption, (5) the inapplicability of the motor carrier exemption, (6) Defendants' liability for unpaid overtime wages, and (7) the liability of Carey International, Inc. as a joint employer and Vince Wolfington as an employer because of his alleged operational control as a corporate officer. Defendants oppose the motion arguing that Plaintiffs have not met the required burden on a motion for summary judgment in any of these categories. Having reviewed the motion, the response and the reply thereto, the entire factual record, and all legal authorities, Plaintiffs' motion is granted only as to the inapplicability of the taxicab and motor carrier exemptions

---

1. In its prior Order, the Court held that because there were genuine issues of material fact, Plaintiffs' SJ Motion as to the statute of limitations and liquidated damages was denied. (*See* DE 322.)

and denied as to the remaining issues. Furthermore, because Plaintiffs have adduced no evidence as to Vince Wolfington's operational control over Carey South Florida, summary judgment is granted in his favor on all claims against him.

## I. Background

Plaintiffs, 15 limousine drivers, seek overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., from three Defendants, who were involved in the limousine transport business at the time relevant to this lawsuit.[2] Defendant Carey International, Inc. ("Carey International") owns a number of subsidiary corporations that engage in limousine services. Two of Carey International's subsidiaries are Defendant Carey Limousine Florida, Inc. ("Carey South Florida") and Manhattan International Limousine Network, Ltd. ("Manhattan"). (Affidavit of Robert Michael Sobol, December 1, 2006 ("Sobol Decl. 1") ¶ 2; Martinez Decl., July 5, 2005 ("Martinez Decl.") ¶ 5.) Defendant Vince Wolfington is the former Chief Executive Officer of Carey International. Throughout this Order, the term "Defendants" shall collectively refer to Carey International, Carey South Florida and Wolfington. Also, for purposes of this action, Defendants do not contest that Defendants Carey International and Carey South Florida are joint employers of Plaintiffs. (Defendants' Response at 25.)

Plaintiffs filed two motions for summary judgment. The first motion related to the calculation of damages to which the Defendants filed a cross-motion. The Court ruled on that motion on February 1, 2007. (See DE 321.) With regard to the second motion, the following undisputed facts are relevant to Plaintiffs' seven issues described above.

As part of their chauffeured transportation business, Defendants provided transportation in sedans, limousines, vans and buses. (Sobol Depo., Dec. 12, 2005 ("Sobol Depo.") at 31, 51.) Defendants advertised their business as providing "Limousine Services," and none of the vehicles had taximeters or vacancy signs. (Id. at 31–32, 64–65; Sobol Decl., July 5, 2005 ("Sobol Decl. 2 ") ¶ 12.) Carey drivers all wore prescribed uniforms and picked up prearranged passengers; they did not cruise for or pick up passengers who hailed them on the streets. (Id. ¶ 6; Defendants' Motion for Summary Judgment on the Issue of Damages at 17.)

As part of its business plan, Carey South Florida had a relationship with Virgin Atlantic Airways Ltd. ("Virgin Atlantic"). The parties debate the nature of the relationship. Plaintiffs claim that Virgin Atlantic had a contractual relationship with Manhattan and that Carey South Florida would solely provide services on behalf of Manhattan when Virgin Atlantic upper class clientele would visit Miami. (See Plaintiffs' SJ Motion at 18.) In support of this assertion, Plaintiffs submitted the testimony of Ed Martinez, who was the Regional Vice President of Operation for both Manhattan and Carey Limousine New York, Inc. (Martinez Decl. ¶¶ 1–11.) Martinez testified that Virgin Atlantic contracted with Manhattan to provide chauffeured transportation services for upper class passengers to and from John F. Kennedy International Airport and Newark Liberty International Airport. (Id. ¶ 6.) He further stated that Manhattan had computer software that was linked to Vir-

---

**2.** Since the onset of this litigation, Defendants have stated that, upon the advice of counsel, they have treated the Plaintiffs as independent contractors and therefore did not pay overtime wages as required by the FLSA. (Wolfington Decl. Dec. 7, 2006) (Wolfington Decl. ¶¶ 8–10, 34.)

gin Atlantic's computer system to facilitate passenger pick ups. (*Id.* ¶ 6.) With regard to their relationship with Carey South Florida, Martinez indicated that Manhattan negotiated with Virgin Atlantic to extend their services to Miami using Carey South Florida. (*Id.* ¶ 10.) Martinez further stated that this was effectuated by Manhattan faxing to Carey South Florida flight information for Virgin Atlantic upper class passengers arriving or departing from Miami the following day. (*Id.* ¶ 10.) Carey South Florida would then contact Manhattan with a confirmation number for the job and then again when the job was completed. (*Id.*) Finally, Manhattan would forward the entire payment collected from Virgin Atlantic to Carey South Florida. (*Id.*)

Defendants claim that Carey South Florida had its own contract with Virgin Atlantic and that the relationship with Manhattan and Virgin Atlantic was akin to a three-party contract. (Defendants' Response to Plaintiffs' SJ Motion ("Defendants' Response") at 23.) In support of this proposition, Defendants submit the testimony of Carey International Chief Executive Officer Devon J. Murphy. Murphy testified that in 1998, Carey International acquired American V.I.P. Limousine ("American VIP"), a Miami-based company. (Murphy Depo. ("Murphy Depo."), Dec. 14, 2005 at 88.) As part of its due diligence in the acquisition of American VIP, Carey International received a schedule summarizing the terms of an oral agreement between Virgin Atlantic and American VIP. (*Id.* at 87–88.) American VIP had been servicing Virgin Atlantic for 11 years, and when Carey International purchased American VIP, it acquired American VIP's contractual agreements and method of operation with Virgin Atlantic, and merged American VIP's operations with Carey South Florida. (*Id.* at 90, 92.) Thereafter, Carey South Florida continued to provide services to Virgin Atlantic pursuant to the oral agreement. (*Id.* at 92.) Because Carey South Florida (through the American VIP acquisition) had an existing relationship with Virgin Atlantic, Manhattan offered to "tuck" the old contract between Carey South Florida and Virgin Atlantic into a new agreement and provide additional services and new rates for Virgin Atlantic in Miami. (*Id.* at 30, 36, 38, 107–09.)

Additionally, Carey South Florida had arrangements with private carriers or destination management companies such as Sentient Jet, Charter Auction and others whereby passengers arrange flights with these private carriers and the carriers arrange ground transportation at the various airports through Carey South Florida. (*Id.* at 110–117) Defendants did not provide written documents detailing these arrangements and have not explained with specificity how the arrangements resulted in the transportation of passengers traveling interstate or internationally, much less a through-ticket arrangement. (*Id.*)

## II. Standard of Review

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Maniccia v. Brown,* 171 F.3d 1364, 1367 (11th Cir.1999). The movant bears the initial responsibility of informing the court of the basis for its motion and of identifying those materials which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In response to a properly supported motion for summary judgment, "the adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts which show a genuine issue for trial."

Fed.R.Civ.P. 56(e). If the non-moving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the court must enter summary judgment for the moving party. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. The court, however, must view the evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Maniccia*, 171 F.3d at 1367.

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court is not to resolve factual issues, but may only determine whether factual issues exist. A material fact is one which "might affect the outcome of the suit under the governing law...." *Id.* at 248, 106 S.Ct. 2505. Therefore, the appropriate inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

## III. Analysis

This analysis discusses the seven issues the parties' papers raise. These matters are addressed in the following sequence: (1) whether the normal two-year statute of limitations should be extended; (2) wheth-er Plaintiffs are entitled to liquidated damages as a matter of law; (3) whether Plaintiffs are entitled to summary judgment on Defendants contractual defenses because they abridge Plaintiffs' rights under the FLSA; (4) whether the taxicab exemption is applicable; (5) whether the motor carrier exemption is applicable; (6) whether Plaintiffs have proven the elements of an FLSA overtime claim as a matter of law; and (7) whether both Carey International and Wolfington are liable as employers as a matter of law.[3]

### 1. The Statute of Limitations

Plaintiffs argue that the statute of limitations should be extended from two to three years because Defendants' failure to pay overtime wages was "willful." Alternatively, Plaintiffs' contend that the statute of limitations should be equitably tolled for six years because Defendants made misrepresentations with respect to Plaintiffs' entitlement to overtime under the FLSA. Defendants claim that they reasonably believed that Plaintiffs were independent contractors not entitled to overtime wages, and therefore, the statute of limitations should not be extended.

### A. "Willfulness"

A claim for overtime wages under the FLSA must be brought within two years from when the cause of action accrued, unless cause of action arises out of "willful" violation on the part of the employer, in which case it must be brought within three years from when the cause of action accrued.[4] 29 U.S.C. § 255(a). A

---

**3.** In various sections of their motion, Plaintiffs attempt to "incorporate by reference" other documents in the record. However, the Court's November 1, 2006 Omnibus Order specifically provided that the parties' page limit for *ALL* summary judgment motions, including both those submitted on November 20, 2006 and December 1, 2006, was **30 pages**. (DE 218.) To allow Plaintiffs to in-corporate by reference other documents would render such instruction meaningless. Therefore, any attempt by any party to incorporate by reference other documents has been disregarded.

**4.** Each failure to pay overtime gives rise to a new cause of action and begins a new statute of limitations period as to that particular

violation of the FLSA was "willful" if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)).[5] The showing needed for a finding of "willful" is demanding in that even if an employer acted unreasonably, if the employer's action was not reckless in determining its legal obligations under the FLSA, such action is not "willful." *Duncan v. Brockway Standard, Inc.*, 1992 WL 510256, 1992 U.S. Dist. LEXIS 21165 (N.D.Ga.1992).

■ Here, Plaintiffs have not met this "demanding" burden of finding that Defendants' alleged failure to pay overtime wages was "willful." Defendants indicated that they sought and followed the advice of counsel as to their FLSA obligations. (Wolfington Decl. ¶¶ 8–10, 34.) Additionally, when Club Limousine Services, Inc. ("Club Limousine") (Carey South Florida's predecessor in interest) was acquired, Carey International received representations and an opinion letter from Club Limousine and its counsel that its chauffeurs were not employees. (*Id.* ¶¶ 23–29, 31.) Finally,

Carey International's outside counsel provided training and legal advice to the general managers of its South Florida subsidiaries that confirmed General Manager of Carey South Florida Michael Sobol's opinion that the chauffeurs working at Carey South Florida were not employees. (Sobol Decl. 1 ¶ 10.) Such facts clearly indicate that, at minimum, there is a question of fact as to whether Defendants' acted with knowledge or reckless disregard in not paying the chauffeurs overtime wages. Therefore, summary judgment on the issue of "willfulness" is denied.

## B. *Equitable Tolling*

Plaintiffs next argue that the statute of limitations should be extended to six years because Defendants intentionally misled the drivers concerning their legal rights under the FLSA.[6] Specifically, Plaintiffs claim that (1) Defendants affirmatively misled drivers in seeking legal advice; (2) Defendants knew that the drivers were employees; (3) Defendants misled the drivers into believing they were independent contractors; and (4) Defendants failed to post the required Department of Labor Notice concerning the rights of em-

---

event. *Knight v. Columbus*, 19 F.3d 579, 582 (11th Cir.1994). Thus, the statutory period for each particular Plaintiff is the relevant limitations period prior to the Plaintiff filing his notice of consent to join the lawsuit.

5. Plaintiffs argue the standard stated in *Trans. World Airlines, Inc.* is not applicable here because that case dealt with an Age Discrimination in Employment Act case rather than an FLSA case. (Plaintiffs' SJ Motion at 2.) However, in making this argument, Plaintiffs completely ignore *McLaughlin*, the dispositive case here, which applied the "willful" definition from *Trans. World Airlines, Inc.* to an FLSA case. *McLaughlin*, 486 U.S. at 135, 108 S.Ct. 1677

6. Plaintiffs also claim that the "continuing-violations" doctrine tolls the statute of limita-

tions. Plaintiffs, however, misconstrue this doctrine which states that each time an employer fails to pay overtime, it constitutes a new FLSA violation and Plaintiffs are entitled to a new statute of limitations period. *Knight v. Columbus, Ga.*, 19 F.3d 579, 582 (11th Cir.1994). The term "continuing violations" is something of a misnomer. It suggests that the original violation, namely the decision to not pay the employee overtime wages, is somehow the source of the employees' present ability to recover. It is not. The statute of limitations period starts with each time an employer fails to pay an employee overtime wages. Thus, the doctrine does not support Plaintiffs' efforts to equitably toll the statute of limitations.

ployees to be paid overtime as required by 29 C.F.R. § 516.4.

■ Because Defendants' failure to post the FLSA notice is the only grounds that Plaintiffs plead in their Fourth Amended Complaint ("FAC") regarding the tolling of the statute of limitations, it is the only ground upon which Plaintiffs may rely. *See Wasco Prods. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir.2006) (holding that a plaintiff seeking to toll the statute of limitations on various grounds must have included the allegation in their pleadings). First, because the record shows that there are questions of fact as to whether Defendants actually did post the FLSA notice, Plaintiffs' summary judgment motion must be denied. Additionally, even if Defendants failed to post the FLSA notice, such is not grounds for equitably tolling the statute of limitations. *See Immacula Antenor v. D & S Farms*, 39 F.Supp.2d 1372 (S.D.Fla.1999) (holding that because the FLSA poster required by 29 C.F.R. § 516.4 makes no mention of the applicable two-year statute of limitations, failure to post it does not toll the statute of limitations). Thus, Plaintiffs, as a matter of law, are not entitled to toll the statute of limitations.[7]

### 2. Liquidated Damages

■■ In little more than a paragraph, Plaintiffs argue that they are entitled to recover liquidated damages for unpaid overtime wages under the FLSA as a matter of law. As the Middle District of Florida has held, "liquidated damages [for violations of the FLSA] are mandatory absent a showing by defendants of good faith." *Leach v. Johnston*, 812 F.Supp. 1198, 1214 (M.D.Fla.1992); accord *Joiner v. Macon*, 814 F.2d 1537, 1539 (11th Cir. 1987) (holding that an employer who knew or who had reason to know that the FLSA applied cannot establish good faith as a defense). Here, Defendants have offered substantial factual support indicating that they did not pay overtime wages to the chauffeurs based on a good faith belief, and advice of counsel, that they were independent contractors. (*See* pg. 8 ¶ 2.) Therefore, based on the record, this Court cannot conclude that there is no genuine issue of material fact concerning the availability of liquidated damages under the FLSA.

### 3. Defendants' Affirmative Defenses

■ Plaintiffs claim generally that they are entitled to summary judgment as to various of Defendants' affirmative defenses.[8] Plaintiffs' sole argument to negate all

---

7. Defendants do not move for summary judgment on the equitable tolling issue, but because Defendants' alleged failure to post the FLSA poster is not grounds for equitably tolling the statute of limitations, they would be entitled to judgment on this issue as a matter of law and the issue need not be presented to the jury.

8. Plaintiffs list the defenses asserted in Paragraphs 90, 93, 97, 98 and 111 of Defendants' answer to the Fourth Amended Complaint [DE 172]. Paragraph 90 discusses Plaintiffs' failure to mitigate their claims by not advising Defendants of their claims or the amount of overtime they worked prior to filing suit. Paragraph 93 states that Plaintiffs are estopped from claiming that they are employees entitled to payment of overtime because they represented in their Independent Operator Agreements ("I/O Agreements") that they acknowledged that they were independent contractors. Paragraph 97 indicates that Carey South Florida is entitled to offset against each Plaintiff sums owed to it under the I/O Agreements, or any amounts advanced on behalf of Plaintiff to third parties of Carey South Florida, or for violation of the provisions of the contractual obligations Plaintiffs owed Defendants. Paragraph 98 states that under the I/O Agreements, some of the Plaintiffs have agreed to indemnify Carey South Florida for its expenses, including attorney's fees, incurred due to Plaintiffs' violation of such agreements. Finally, Paragraph 11 alleges that by asserting that they are employees entitled to FLSA protection, Plaintiffs have disavowed the "fundamental, indivisible premise"

five stances is that such defenses abridge or deny Plaintiffs their rights under the FLSA. (Plaintiffs' SJ Motion at 15–16.) In support of this proposition, Plaintiffs cite to *Lynn's Food Stores, Inc. v. U.S. ex rel. U.S. Dep't of Labor,* 679 F.2d 1350, 1352 (11th Cir.1982) (*"Lynn's Food Stores"*).

However, the holding in *Lynn's Food Stores,* that there are only two ways in which FLSA claims can be settled or compromised, does not as a matter of law directly negate Defendants' "defenses."[9] Plaintiffs' citations to dicta in *Lynn's Food Stores* that the FLSA provisions are not subject to negotiation or bargaining and that FLSA rights cannot be abridged by contract or otherwise waived, refer to the fact that employers and employees cannot agree to deviate from the FLSA because employers and employees have unequal bargaining power. *Id.* at 1352. Although the issues have not been briefed, based on the limited knowledge that the Court has of the record facts, the "defenses" at issue do not exhibit instances in which the parties expressly agreed to abridge or otherwise waive Plaintiffs' FLSA rights in this regard. Therefore, Defendants' five asser-

tions that Plaintiffs (1) failed to mitigate the claims, (2) are estopped from bringing the claims, (3) are subject to an offset for sums owed to Defendants, (4) have agreed to indemnify Defendants for various costs incurred due to violation of the I/O Agreements, and (5) have rendered the I/O Agreements unenforceable will have to wait until the issues are properly presented. Therefore, Plaintiffs' motion for summary judgment as to the listed affirmative defenses is denied.

### 4. The Taxicab Exemption

Defendants previously moved for summary judgment on the application of the taxicab exemption.[10] The Court held that Defendants did not meet their burden of establishing the applicability of the exemption. Specifically, the Court found that Defendants were not entitled to summary judgment because Carey South Florida (1) advertised itself as a worldwide chauffeured transportation service, (2) employed drivers that did not cruise for passengers, and (3) charged fares based on a flat or hourly rate (as opposed to a metered rate). (*See* DE 136 at 14–16.)

---

underlying the I/O Agreements and therefore, all the non-procedural provisions of the I/O Agreements have lost "all force and effect." (DE 172.)

**9.** In *Lynn's Food Stores,* the Department of Labor ("DOL") concluded that Lynn's Food Stores, Inc. ("Lynn's") had violated the FLSA provisions concerning, *inter alia,* minimum wage, overtime and record keeping and determined that Lynn's was liable to its employees for back wages and liquidated damages. After various unsuccessful attempts to settle with the DOL, Lynn's approached the employees directly in an attempt to resolve the dispute, and 14 of the employees agreed to a settlement. Lynn's then brought suit in district court seeking judicial approval of the settlement.

The Eleventh Circuit stated that there are only two ways in which claims arising under the FLSA can be settled or compromised.

*Lynn's Food Stores, Inc.,* 679 F.2d at 1352. First, the Secretary of Labor could supervise the payment to employees of unpaid wages, and then such employees waive their right to bring a lawsuit. *Id.* at 1353. Second, the employee can bring suit against the employer under 29 U.S.C. 216(b) to recover back wages for FLSA violations. *Id.* The appellate court stated that when the employees bring a claim for back wages under the FLSA and then present to the district court a proposed settlement, the district court may enter a stipulated judgment after scrutinizing the settlement for fairness. *Id.* Finally, the Eleventh Circuit held that the agreements that Lynn's submitted for approval did not fall into either category. *Id.*

**10.** The FLSA exempts from its overtime provisions "any driver employed by an employer engaged in the business of operating taxicabs." *See* 29 U.S.C. § 213(b)(17).

■ Plaintiffs now move for summary judgment arguing that the taxicab exemption is not applicable. Thus, Plaintiffs have the burden of showing that there is no genuine issue of fact and that the taxicab exemption does not apply as a matter of law. Also, it is a well-established principle that exemptions under the FLSA are to be construed narrowly against the employer, such that employees are not exempted from overtime unless it is the clear intent of Congress. *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).

■ The relevant facts are not in dispute, and as to the law, Plaintiffs rely on *Rossi v. Boroday,* 438 F.Supp.2d 1354, 1361–1364 (S.D.Fla.2006). In that case, Magistrate Judge Bandstra held that the plaintiffs were entitled to judgment as a matter of law as to the inapplicability of the taxicab exemption because the *Rossi* defendants advertised themselves as a limousine company, did not own or operate taxicab transportation, and used vehicles that did not have taximeters, but rather charged on a flat or hourly basis. *Id.* at 1363.

Defendants argue that the *Rossi* decision was incorrect because the term "taxicab" was inaccurately defined to preclude a limousine company from falling within the exemption. Defendants claim that the DOL's definition of "business of operating taxicabs"[11] should be given great deference and that under such definition, they fall within the taxicab exemption.

Here, Defendants can hardly deny that the facts in this case are almost identical to those in *Rossi.* Defendants acknowledge that they advertise as "limousine services," that their vehicles are not metered and do not have vacancy signs, and that the drivers do not cruise for passengers.[12] Further, while it is true that Defendants operate like a taxicab company in a certain respect under the DOL definition, in that customers determine the destination, they do not meet other aspects of the definition including that the business includes "occasional and unscheduled trips to or from transportation terminals as the individual passengers may request" or that the business includes "stands at transportation terminals as well as at other places where numerous demands for taxicab transportation may be expected."

Moreover, under the plain meaning of 29 U.S.C. 213(b)(17), Defendants are not in the business of operating taxicabs; they are in the business of providing limousine service. *See Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (stating that courts properly assume, absent sufficient indication to the contrary, that Congress intends the words

---

**11.** The DOL defines the "Business of operating taxicabs" as follows. "The taxicab business consists normally of common carrier transportation in small motor vehicles of persons and such property as they may carry with them to any requested destination in the community. The business operates without fixed routes or contracts for recurrent transportation. It serves the miscellaneous and predominately local transportation need of the community. It may include such occasional and unscheduled trips to or from transportation terminals as the individual passengers may request, and may include stands at the transportation terminals as well as at oth-

er places where numerous demands for taxicab transportation may be expected." Field Operations Handbook, Dept. of Labor, Ch. 24h (1999 ed.).

**12.** While there is no conclusive evidence in the record regarding whether Defendants own any taxicabs, the only reasonable inference is that they do not. (*See* Sobol Depo. at 31, 51) (stating that Defendants owned sedans, limousines, vans and buses and none of them had taximeters; and later stating that "I don't know that [Carey South Florida] owns any taxicabs.")

in its enactments to carry "their ordinary, contemporary, common meaning"). The inapplicability of the taxicab exemption to these Defendants is consistent with *Rossi* and other decisions which have addressed this issue under circumstances where the vehicles are more similar to "taxicabs" than in the case at bar. *See Wirtz v. Cincinnati, Newport and Covington Transportation Co.*, 375 F.2d 513 (6th Cir. 1967) (finding that "red top" sedans which were not metered, did not have vacancy signs and which were not advertised as taxicabs did not fall under the taxicab exemption); *Herman v. Brewah Cab. Inc.*, 992 F.Supp. 1054 (E.D.Wis.1998) (taxicab exemption did not apply to a transportation service for the elderly and handicapped); *see also* Opinion Letter, Wage and Hour Division of the U.S. DOL, 1998 WL 852774, at * 1 (April 17, 1998) (stating that the "ordinary meaning" of the term taxicabs contemplates vehicles that are offered for hire to the general public on city streets and while it is not necessary that all the transportation be provided to persons who "flag down" the vehicles, that is an important aspect of the common meaning of "taxicab"). Accordingly, as a matter of law, Defendants do not fall within the taxicab exemption and Plaintiffs are entitled to summary judgment on this issue.

### 5. The Motor Carrier Exemption

Defendants also previously moved for summary judgment on the application of the motor carrier exemption. The motor carrier exemption, 29 U.S.C. § 213(b)(1), mandates that overtime pay is not required for any employee with respect to whom the Secretary of Transportation ("Secretary") has power to establish "qualifications and maximum hours of service pursuant to section 21502" of the Motor Carrier Act ("MCA"). The Court previously found that the motor carrier exemption applies if the following two part test is met: (1) the employee plaintiff must be employed by carriers whose transportation of passengers is subject to the Secretary's jurisdiction under section 204 of the Motor Carrier Act ("MCA"); and (2) the employee plaintiff engaged in activities of a character directly affecting the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the MCA (29 C.F.R. § 782.2). (*See* DE 136 at 9.) With regard to the first requirement, the Court held that 49 U.S.C. § 13501 gives the Secretary jurisdiction over transportation by motor carrier if, *inter alia*, it transports persons by motor carrier between a place in a state and a place in another state or "in the practical continuity of movement in the flow of interstate commerce." (*Id.* at 9–10.) Defendants argued that Carey South Florida's relationship with Virgin Atlantic satisfied the interstate commerce through-ticket requirement. Because the litigation was at an early stage and the parties had not had an opportunity to conduct much discovery, the Court could not resolve the issue of whether there was a through-ticketing arrangement between Carey South Florida and Virgin Atlantic. However, now that discovery has ended and the parties have produced all their evidence, Plaintiffs' SJ Motion presents the opportunity to take a second look at the issue. (*Id.* at 14.)

The dispositive question is whether Defendants' relationship with Virgin Atlantic constitutes a through-ticket system. In a case factually identical to the one at bar, involving a similar plaintiff and the same defendants, *Richard Cartun v. Carey Int'l, Inc., et al*, Case No. 04–21074–Civ–UUB ("*Cartun*"), Judge Ungaro–Benages held that the motor carrier exemption did not apply to a limousine company where there was insufficient evidence to demonstrate that it was a party to a through-ticketing

**1180**

arrangement with an air carrier.[13] *Id.* at 9–11. In arriving at this conclusion, Judge Ungaro–Benages relied substantially on the ICC decisions in both *Motor Transp. of Passengers Incidental to Air,* 95 M.C.C. 526 (1964) ("*Motor Transp.*") and *James T. Kimball—Petition for Declaratory Order,* 131 M.C.C. 908, 1980 WL 14197 (1980) ("*Kimball* ").[14] In both of these decisions, the ICC concluded that the relevant motor carrier was involved in *intrastate* commerce because they did not have a common arrangement or through-ticketing system with an out-of-state air carrier to transport passengers coming into a state or departing from a state.[15]

13. Judge Ungaro–Benages specifically found that there was insufficient evidence that the defendants were a party to an agreement with Virgin Atlantic and that there was no evidence of the terms of the agreements with any destination management companies. *Cartun* at 10. Additionally, the Court also held that defendants had failed to explain with specificity how their arrangements with such destination management companies resulted in the transportation of passengers traveling interstate or internationally. *Id.*

14. Judge Ungaro–Benages stated that to determine whether the Secretary of Transportation has jurisdiction over the terms of Plaintiffs' employment pursuant to the Motor Carrier Act, the Court begins, and ends with decisions rendered by the Interstate Commerce Commission ("ICC") and its successor, the Surface Transportation Board regarding the Department of Transportation's jurisdiction over limousine drivers providing wholly intrastate transportation to and from international airports. *Id.* at 9.

15. In *Motor Transp.,* the ICC held that the motor transportation of passengers between an airport and another point in the same state by a motor carrier "operating wholly within a State, selling no through tickets, and having no common arrangements with connecting out-of-State carriers" represents *intrastate* commerce regardless of the passengers' intention to continue or complete an interstate journey. 95 M.C.C. 536. In *Kimball,* the petitioner's motor carrier operation was conducted as part of a package tour originating at points outside of Florida, and involving air

*A. The Evidence of a Through–Ticketing Arrangement with Virgin Atlantic is Insufficient.*

 Here, after almost a year of discovery, again Defendants have not provided sufficient evidence of an alleged common arrangement or through-ticketing service between Carey South Florida and Virgin Atlantic to create an issue of fact for a jury. Defendants do not submit any written evidence of the agreement, but rather only offer the testimony of Carey International Chief Executive Devon Murphy to support their contention that such a relationship does exist.[16] Defendants claim that Murphy's testimony clarifies

transportation to Florida, motor carrier transportation from the airport of arrival to the hotel, motor carrier transportation from the hotel to the airport of departure and air transportation out of Florida. The travel and tour agency sold to its customers complete one-price package tours providing all the necessary transportation. The petitioner would bill the travel and tour agency and not the passengers for the round trip local ground transportation which the petitioner performed. In finding that the petitioner's motor carrier transportation was *intrastate* as opposed to *interstate,* the Commission concluded that the common arrangement or through ticketing referred to in that case was not an arrangement between the motor carrier and the air carrier, and because the petitioner's arrangements were through a travel or tour agency, it was not *interstate* commerce. *Id.* at 917, 1980 WL 14197 (emphasis added).

16. Plaintiffs argue that based on *Van T. Junkins and Assocs. v. U.S. Indus.,* 736 F.2d 656 (11th Cir.1984) ("*Van T. Junkins* "), the Court must disregard Murphy's testimony because Defendants' submission of evidence "is the manufacture of a sham question of fact." (Plaintiffs SJ Motion at 18.) Such argument is without merit. In *Van T. Junkins,* the Eleventh Circuit addressed the question of whether a deposition that contradicts a prior affidavit from the *same witness* can create an issue of fact. (Emphasis added.) Here, Plaintiffs have made no specific allegations that a witness' own testimony conflicts. Thus, the authority is not on point with the facts of this case.

Manhattan Vice President Ed Martinez's testimony which appears to indicate that Manhattan has a relationship with Virgin Atlantic and uses Carey South Florida as a type of subcontractor. However, in his own words, when asked if Carey South Florida had an ongoing direct contractual relationship with Virgin Atlantic, Murphy stated, "I don't know specifically whether it's directly or what the form of it is. I do know that we acquired a company in 1998 whose, you know largest customer was Virgin Atlantic." (Murphy Depo., Dec. 14, 2005 at 30.) Murphy also stated when asked if Carey South Florida has an actual written contract with Virgin Atlantic, that "I don't know whether they do or don't. I just know when we acquired the company in '98 I believe there was a contract." (*Id.* at 36.) Thus, Murphy's testimony does not offer any evidence based on personal knowledge as to Carey South Florida's relationship with Virgin Atlantic, nor whether Carey South Florida had a through-ticketing arrangement with the airline.

Further, Murphy's testimony as to the existence of a due diligence schedule in the American VIP acquisition that discusses a verbal agreement between Carey South Florida and Virgin Atlantic is also insufficient to create a genuine dispute for a jury to resolve. First, Defendants did not offer the schedule into evidence. Second, the existence of an oral relationship between American VIP and Virgin Atlantic prior to the acquisition by Carey International does not answer the question of whether post-acquisition, Carey South Florida and Virgin Atlantic possessed a *through-ticketing arrangement.* Finally, Murphy's testimony suggests that Manhattan "tuck[ed]" the "oral agreement" between Carey South Florida and Virgin Atlantic into its own agreement with Virgin Atlantic. This fact taken together with the fact that Manhattan would fax or otherwise transmit to Carey South Florida jobs from Virgin At-

lantic establishes that Manhattan had the arrangement with Virgin Atlantic, not Carey South Florida.

Therefore, the undisputed facts, taken in the light most favorable to the non-moving party, make clear that at the time relevant to the issues in this case, Carey South Florida did not possess a through-ticketing arrangement with Virgin Atlantic. Defendants have established at most that Virgin Atlantic and Manhattan are parties to an agreement regarding the transportation of upper class passengers. As such, Plaintiffs do not fall under the jurisdiction of the DOT under the tests presented in *Motor Transp.* and *Kimball.*

B. *Carey South Florida's Relationship with Private Carriers/Destination Management Companies also does not Satisfy the Requirement of a Through–Ticketing Arrangement.*

■ Defendants' contention that Carey South Florida has a through-ticketing arrangement with private carriers such as Sentient Jet, Inc., Charter Auction, Inc. and others is also not supported by admissible record evidence. The standards presented in *Motor Transp.* and *Kimball* require that the motor transportation carrier possess a through-ticketing arrangement with an out-of-state air carrier. Similar to the facts in *Cartun,* Defendants, after almost a year of discovery, have provided no evidence that the private carriers they do business with provide service between states or internationally. Nor have the Defendants placed in evidence the actual agreements on which they purport to rely. Thus, Defendants have not made the requisite showing to establish the existence of an essential element to their affirmative defense, on which they will bear the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

Moreover, the system Murphy described—whereby a passenger makes a

reservation with a private aviation company, which makes a reservation with Carey International, who in turn transmits the information to one of its subsidiaries, would be a tsunami-size sweep of employees into the motor carrier exemption. Under Defendants' interpretation, any employee at any Carey International subsidiary that receives a job from Carey International pursuant to one of these private carrier agreements, would have no FLSA protections. This interpretation clearly runs fowl of the tenet that exemptions under the FLSA are to be construed narrowly against the employer. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). Additionally, this situation is clearly inconsistent with the through-ticketing arrangement with an air carrier prescribed in *Motor Transp.* and *Kimball* for inclusion in the motor carrier exemption. Here, the relationship purports to be between Carey International, not Carey South Florida, and various private carriers. Thus, considering the slim record evidence taken in the light most favorable to the non-moving party, Carey South Florida's relationship with private carriers does not bring their employees' activity within the jurisdiction of the Secretary. Therefore, the motor carrier exemption does not apply and Plaintiffs are entitled to judgment on this affirmative defense as a matter of law.[17]

17. Because the Court has found that Defendants are not entitled to claim that they are exempt from the FLSA pursuant to the motor carrier exemption prior to the August 10, 2005 amendment to the MCA, the Court need not address the post-amendment consequences for Defendants.

18. Defendants also argue that Plaintiffs did not previously raise the issue of whether Plaintiffs are individually engaged in commerce in the Complaint. Defendants assert, however, that if they had, Defendants would not have contested the issue.

### 6. The FLSA Overtime Claim

Plaintiffs next argue that they are entitled to summary judgment on their FLSA overtime claim. Plaintiffs argue that under the Pattern Jury Instructions for the Eleventh Circuit, § 1.71, p. 127–29 (2000 ed.), there are three elements in an FLSA overtime claim: (1) that Plaintiffs were employed by the Defendants, (2) that Plaintiffs were engaged in commerce; and (3) that Defendants failed to pay Plaintiffs overtime required by the law. With regard to the first two elements, Defendants Carey International and Carey South Florida are not contesting that they are joint employers of Plaintiffs and are enterprises engaged in commerce as defined by 29 U.S.C. § 203(r) and 203(s).[18] With regard to the third element, Plaintiffs assert that "Defendants' own expert witness report set forth that the Plaintiffs did in fact work overtime." (Plaintiffs' SJ Motion at 22.) However, Plaintiffs' papers do not point out exactly what in Defendants' expert witness report evidences which Plaintiffs worked overtime, which weeks they worked overtime, or how many hours of overtime they worked.[19] The precise number of hours Plaintiffs worked are clearly in dispute and remain unresolved. Thus, these factual disputes which are material to the outcome of this case cannot be resolved at this stage of the litigation. *See Rossi*, 438 F.Supp.2d at 1365 (finding that

19. The Court has reviewed the record and cannot find the Expert Witness Report on which Plaintiffs purportedly rely. As Defendants note, this is likely because the Expert Witness Report is not "in evidence." (*See* Defendants' Statement of Facts at 14.) Pursuant to S.D. Fla. L.R. 7.5.C(2), summary judgment motions must be supported by *specific* references to pleadings, depositions, answers, to interrogatories, admissions and evidence on file with the Court. (Emphasis added.) Further, the Court is not required to scour the record for documents referenced by a moving party. *Coggin v. Longview Indep. Sch. Dist.*, 337 F.3d 459, 469 (5th Cir.2003).

summary judgment was improper where the precise number of hours that plaintiff worked was in dispute and unresolved).

### 7. The Liability Of Carey International, Inc. And Vincent Wolfington.

Plaintiffs next seek summary judgment regarding the liability of both Carey International and Wolfington.[20] Defendants have not contested that Carey South Florida and Carey International are joint employers of the Plaintiffs.[21] Plaintiffs state that they seek summary judgment regarding Carey International's liability in effort to avoid an inconsistent verdict whereby Carey South Florida is found to be guilty, but Carey International is not. Plaintiffs concerns, however, are unfounded. Because the issue of Carey International's liability is not contested, the jury will not be required to make such a determination. Additionally, Plaintiffs have failed to put forth any facts requiring the conclusion that Carey South Florida and Carey International are joint employers. *See* Fed. R.Civ.P. 56(c) (stating that the party moving for summary judgment "must show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"). Therefore, summary judgment as to Carey International's liability is denied.

 With regard to Wolfington's liability, Plaintiffs claim that Wolfington had operational control of and set policy for Defendants which makes him an "employer" for the purposes of the FLSA. An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C § 203(d). "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer under the FLSA for unpaid wages." *Patel v. Wargo*, 803 F.2d 632, 637–638 (11th Cir.1986) (citing *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir.1983)). To be personally liable, an officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee. *Id.* at 638. The proper criteria for a court to analyze in determining if a an individual is an employer for the purposes of the FLSA is whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised or controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employee records.

 Here, Plaintiffs have offered no evidence that Wolfington participated in any of these activities. There is no evidence that Wolfington had the power to hire and fire employees at Carey South Florida,[22] controlled the drivers' schedules,

---

20. Defendants contend that summary judgment should be granted in their favor as to the liability of Wolfington because the undisputed facts demonstrate that he had no operational control. (Defendants' Response at 31.)

21. In their answer to the FAC, Defendants state, "For the purposes of this action only, Defendants neither admit nor contest Plaintiffs' allegations that any of the Defendants are joint employers of Plaintiffs. Although Defendants believe they can, in good faith dispute such allegations, they have decided

not to litigate the issue of whether they are Plaintiffs' joint employers in this case—and only in this case—as a compromise of an otherwise disputed fact, in order to narrow the issues between the parties, and thereby to conserve judicial resources and limit the issues for purposes of discovery, pretrial proceedings, and trial." (FAC ¶ 6.)

22. Plaintiffs submit as evidence of Wolfington's power to terminate employees, evidence of correspondence sent by former Carey South Florida employee Lieberman to Wolf-

determined their base rate or fixed gratuity, or had any involvement with employee records. In fact, none of the testimony purporting to show that Wolfington has operational control over Carey is based on personal knowledge as required under Rule 56(e).[23] Fed.R.Civ.P. 56(e) (stating "[s]upporting and opposing affidavits shall be made on personal knowledge"). Plaintiffs conclusory statements are insufficient evidence on a summary judgment motion as none of this testimony establishes that Wolfington had operational control of Carey South Florida. Because Plaintiffs failed to make out a prima facie case of liability against Wolfington, there is nothing to send to the jury on the question of his liability.

While Plaintiffs have put forth no evidence illustrating Wolfington's operational control over Defendants, Defendants have put forth evidence indicating that Wolfington had no such control. Robert Sobol, General Manager of Carey South Florida testified that Wolfington had no role in hiring, firing, contracting with, termination of, or decisions about whether and what to pay chauffeurs at Carey South Florida. (Sobol Decl. ("Sobol Decl. 3"), Feb. 28, 2002 ¶ 26.) Sobol also testified that Wolfington had nothing to do with the day-to-day operations of Carey South Florida. (*Id.*) In his deposition, Wolfington states that the management of a subsidiary is done by the local management (Wolfington Depo., July 20, 2004 at 14). Wolfington also denied receiving any correspondence from Lieberman (Wolfington Decl. 1 ¶ 19; Wolfington Depo., at 124, 137–38.); and he testified he did not recognize the names of any of the Plaintiffs (Wolfington Decl. 1 ¶ 18); and none of the Plaintiffs have spoken to him about their alleged entitlement to overtime. (Defendants Statement of Facts ¶ 54 (referencing the depositions of various Plaintiffs.)) [24]

Thus, because Defendants have established that Wolfington did not exercise operational control over Plaintiffs (and that he had never spoken to most of them) and the complete lack of evidence otherwise, Wolfington is entitled to summary judgment.

---

ington. The letters purport to complain about limousine drivers being misclassified as independent contractors. Plaintiffs claim that Lieberman was fired as result of this correspondence. (Plaintiffs SOF ¶¶ 59–62.) Again, Plaintiffs' speculative allegation that Wolfington had operational control because he allegedly fired Lieberman based on a letters he received from Lieberman, is not based on personal knowledge and is not sufficient for summary judgment.

**23.** Plaintiffs only offer their own speculative testimony that Wolfington had any "operational control." Plaintiffs offer the testimony of Plaintiffs Zapata, Lieberman and McIntyre for the proposition that Wolfington had operational control of Carey. Plaintiffs, however, blatantly misrepresent these Plaintiffs' testimony. For example, Zapata, when asked if Wolfington had operational control of Carey, only makes the statement, "In that time, I would think so." (Zapata Depo., Oct. 3,

2006, at 41.) Further, Lieberman testified that he believed that Wolfington made the decision not to pay overtime because he had heard that "Wolfington runs the company" in "passing conversations." (Lieberman Depo. June 9, 2004 at 187.) Finally, McIntyre testified only that both Mike Sobol and Mike Mahoney told him that "Wolfington was the top management, and that everything was done, everything that [they did] came from him, and it was done at his direction, anything directed or designated." (McIntyre Depo., July 27, 2006, at 100.)

**24.** The Court also notes that Magistrate Judge Simonton, in *Gutescu v. Carey International, Inc.*, Case No. 01–4926–CIV–MARTINEZ/KLEIN, found that Carey South Florida was "managed locally without any direction by Wolfington." (*See Gutescu v. Carey International, Inc.*, Case No. 01–4926–CIV–Martinez/Klein.)

## IV. Conclusion

For the reasons set forth herein, it is hereby

ORDERED that

(1) Plaintiffs' Motion For Partial Summary Judgment on all Issues Other Than Issues Related to the Calculation of Damages [DE 241] is GRANTED IN PART AND DENIED IN PART.

(2) Plaintiffs' motion for summary judgment as to an extension of the statute of limitations is DENIED. Whether Defendants' failure to pay overtime wages was "willful" is a genuine question of fact for the jury. Also, as a matter of law, the statute of limitations should not be equitably tolled.

(3) Plaintiffs' motion for summary judgment as to liquidated damages is DENIED.

(4) Plaintiffs' motion for summary judgment as to Defendants' affirmative defenses is DENIED.

(5) Plaintiffs' motion for summary judgment as to the inapplicability of the taxicab exemption is GRANTED.

(6) Plaintiffs' motion for summary judgment as to the inapplicability of the motor carrier exemption is GRANTED.

(7) Plaintiffs' motion for summary judgment as to the Defendants' liability under the FLSA is DENIED.

(8) Plaintiffs' motion for summary judgment as to the liability of Carey International and Vince Wolfington is DENIED.

(9) Because Plaintiffs have put forth no evidence that Wolfington had any operational control over Carey South Florida, summary judgment is GRANTED in favor of Defendants as to Wolfington's liability, and the claims against Defendant Wolfing-ton are DISMISSED WITH PREJUDICE.

### ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION

■ THIS MATTER is before the Court on Defendants' Motion for Reconsideration [DE 375]. Pursuant to Rule 60(b), Defendants ask the Court to reconsider its March 1, 2007 Order Granting Plaintiffs' Partial Summary Judgment Motion ("March 1, 2006 Order") [DE 371]. A Rule 60(b) motion may provide relief from judgment due to, inter alia, "mistake, inadvertence, surprise, or excusable neglect." Fed.R.Civ.P. 60(b)(1) (2007). Motions made under Rule 60(b) are within the sound discretion of the district court. *Turner v. Secretary of Air Force*, 944 F.2d 804, 807 (11th Cir.1991).

■ Here, Defendants state that in their response to Plaintiffs' summary judgment motion, they inadvertently failed to refer to certain evidence previously filed in the record that is relevant to their motor carrier exemption affirmative defense. Specifically, Defendants indicate that certain exhibits to Devon Murphy's deposition were put into the record on January, 3, 2006,[1] more than a year prior to the Court's March 1, 2006 Order. As of March 1, 2007, the docket contained over 350 entries, not including the abundance of exhibits attached to the various filings. The Court is not required to "scour the record" looking for evidence to support Defendants' arguments. *See Coggin v. Longview Indep. Sch. Dist.*, 337 F.3d 459, 469 (5th Cir.2003). Thus, such omission was clearly the sole fault of the Defendants and given that this action is on the eve of trial, Plaintiffs would be prejudiced

---

1. The record reveals that the exhibits were actually filed on December 30, 2005. (*See* DE 97.)

if the Court were to reconsider its decision.

■ More importantly, however, had the Court reviewed the evidence relating to alleged contracts with Virgin Atlantic and other private carriers, the Court's decision would not have been different. As the March 1, 2007 Order stated, after noting the insufficient evidence of an oral contract with Virgin Atlantic, "the existence of an oral relationship between American VIP and Virgin Atlantic prior to the acquisition by Carey International does not answer the question of whether post-acquisition, Carey South Florida and Virgin Atlantic possessed a *through-ticketing arrangement.*" (*See* DE 371.) Similarly, the omitted acquisition schedule to which Defendants refer says nothing about a through-ticketing system. (*See* Murphy Depo. Exh. G.) Thus, these additional documents do not provide sufficient evidence to create a jury issue on the motor carrier exemption defense.

Additionally, a review of the private carrier agreements that Defendants now references does not illustrate any new facts that would alter the Court's decision. Rather, the agreements, which were executed by Carey International, not Carey South Florida, merely result in Carey International and its affiliates becoming the preferred chauffeured transportation service provider to the private carriers. (*See* Murphy Depo, Exh. K at 2; Murphy Depo. Exh. L at 1–2; Murphy Dep. Exh. M at 6.) For example, the private carrier agreements suggest that rather than automatically booking limousine service when the passenger makes a reservation with the private carrier, as is typical in a through-ticket arrangement, the private carrier simply calls Carey's central reservation center to arrange a car just as any other customer would. (*See* Murphy Depo, Exh. K, Art. 2; Murphy Depo. Exh. L at 4;[2] Murphy Dep. Exh. M at 6.) Such an arrangement is merely a loose affiliation between businesses and does not constitute a *through-ticketing arrangement* for purposes of the motor carrier exemption.

Moreover, the Court noted that to use Defendants' relationships with private carriers to bring them within the motor carrier exemption would be:

> a tsunami-size sweep of employees into the motor carrier exemption. Under Defendants' interpretation, any employee at any Carey International subsidiary that receives a job from Carey International pursuant to one of these private carrier agreements, would have no FLSA protections. This interpretation clearly runs fowl of the tenet that exemptions under the FLSA are to be construed narrowly against the employer. *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (U.S.1960). Additionally, this situation is clearly inconsistent with the through-ticketing arrangement with an air carrier prescribed in *Motor Transp.* and *Kimball*[3] for inclusion in the motor carrier exemption.

(*See* DE 371 at 20.) Thus, because the private carrier agreements do not evidence the existence of a through-ticketing arrangement and the narrow parameters of the motor carrier exemption, there re-

---

**2.** It is also notable that the private carrier agreement with Universal Weather and Aviation, Inc. specifically contemplates that in the future the parties may have an automatic reservation service, but such system is not currently in operation. (Murphy Depo. Exh. L at 4.)

**3.** *Motor Transp. of Passengers Incidental to Air,* 95 M.C.C. 526 (1964) and *James T. Kimball—Petition for Declaratory Order,* 131 M.C.C. 908, 1980 WL 14197 (1980).

mains no factual dispute as to whether such exemption applies.

Accordingly, for the reasons set forth herein, it is hereby

ORDERED that Defendants' Motion for Reconsideration [DE 375] is DENIED.